UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NATHANIEL PORTER,

    Plaintiff,                                      Hon. Richard Alan Enslen

v.                                                        Case No. 1:05 CV 562

PATRICIA CARUSO, et al.,

    Defendants.
_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on Defendant Burnett's Motion for Summary Judgment. (Dkt. #172). Pursuant to 28 U.S.C. § 636(b)(1)(B), the undersigned recommends that Defendant's motion be **denied**.

## BACKGROUND

Plaintiff asserts that he is an adherent of an ancient Egyptian religion known as Kemetic Spiritual Science. Plaintiff alleges that as part of his religious faith he legally changed his name to N. Kalonji Owusu I, a practice permitted by Michigan Department of Corrections (MDOC) policy. In his amended complaint, Plaintiff asserted several claims against Defendants Caruso, Burnett, Morris, Bozung, and Parsons. (Dkt. #79). Specifically, Plaintiff asserted that prison officials refused to recognize his new legal name and instead forced him to refer to himself by his former name in violation of his First Amendment right to freely practice his religion. Plaintiff asserted that he was retaliated against and denied store privileges for insisting on using (and being identified by) his new legal name.

Plaintiff alleged that his requests to possess an ankh cross and participate in the Kosher meal plan were improperly denied. Plaintiff also challenged the constitutionality of several Michigan Department of Corrections policies pursuant to which Defendants allegedly acted.

Most of Plaintiff's claims were subsequently dismissed for failure to exhaust administrative remedies or on summary judgment grounds. The only claims remaining in this matter are Plaintiff's claims under the First Amendment and the Religious Land Use and Institutionalized Persons Act (RLUIPA) that Defendant Burnett unlawfully denied his request to purchase an ankh cross. Defendant Burnett previously moved for summary judgment, without success. Defendant Burnett again moves for summary judgment.

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A party moving for summary judgment can satisfy its burden by demonstrating "that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." *Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005); *see also*, *Amini v. Oberlin College*, 440 F.3d 350, 357 (6th Cir. 2006) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The fact that the evidence may be controlled or possessed by the moving party does not change the non-moving party's burden "to show sufficient evidence from which a jury could reasonably find in her favor, again, so long as she has had a full opportunity to conduct discovery." *Minadeo*, 398 F.3d at 761 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)).

Once the moving party has met its burden of production, the non-moving party "must identify specific facts that can be established by admissible evidence, which demonstrate a genuine issue for trial." *Amini*, 440 F.3d at 357 (citing *Anderson*, 477 U.S. at 247-48; *Celotex Corp. v. Catrett*, 477 U.S. at 324). While the Court must view the evidence in the light most favorable to the nonmoving party, the party opposing the summary judgment motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Amini*, 440 F.3d at 357. The existence of a mere "scintilla of evidence" in support of the non-moving party's position is insufficient. *Daniels v. Woodside*, 396 F.3d 730, 734-35 (6th Cir. 2005) (quoting *Anderson*, 477 U.S. at 252). The non-moving party "may not rest upon [his] mere allegations," but must instead present "significant probative evidence" establishing that "there is a genuine issue for trial." *Pack v. Damon Corp.*, 434 F.3d 810, 813-14 (6th Cir. 2006) (citations omitted).

Moreover, the non-moving party cannot defeat a properly supported motion for summary judgment by "simply arguing that it relies solely or in part upon credibility determinations." *Fogerty v. MGM Group Holdings Corp., Inc.*, 379 F.3d 348, 353 (6th Cir. 2004). Rather, the non-moving party "must be able to point to some facts which may or will entitle him to judgment, or refute the proof of the moving party in some material portion, and. . .may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof." *Id.* at 353-54. In sum, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Daniels*, 396 F.3d at 735.

## ANALYSIS

According to Plaintiff, the ankh cross is "the primary symbol of [his] ancient Egyptian religious beliefs and practices." (Dkt. #79 at ¶ 95). Plaintiff asserts that the ankh cross is a necessary component of many of the rituals and ceremonies of his faith. (Dkt. #178, Exhibit A at 12-23). Plaintiff asserts that he lost his ankh cross on or about January 20, 2003. (Dkt. #79 at ¶ 101). Plaintiff claims that he had been permitted to wear an ankh cross since at least 2001. (Dkt. #178, Exhibit D at ¶ 17). As a result of a change in MDOC policy and because Plaintiff's religious beliefs are characterized as "non-traditional," Plaintiff was required to receive permission to purchase a replacement ankh cross. (Dkt. #79 at ¶¶ 92-99). Plaintiff's request to purchase a replacement ankh cross was denied by Defendant Burnett. (Dkt. #79 at ¶¶ 101-08).

In his prior motion for summary judgment, Defendant Burnett asserted that he denied Plaintiff's request to purchase a replacement ankh cross on the grounds that: (1) an ankh cross was not a religious item; (2) not necessary for the practice of Plaintiff's faith; and (3) that Plaintiff's religious beliefs are not sincerely held. In the present motion, however, Defendant Burnett asserts a new justification for denying Plaintiff's request for an ankh cross. Defendant Burnett now claims that he is entitled to summary judgment because the MDOC's Security Threat Group (STG) Coordinator, Robert Mulvaney, has expressed the concern that permitting Plaintiff to wear an ankh cross *may* constitute a security threat.

Defendant Burnett acknowledges that his initial decision to deny Plaintiff's request to purchase an ankh cross was not premised on security concerns such as those expressed by Robert Mulvaney. Not surprisingly, Plaintiff asserts that Mulvaney's opinions are not relevant in this matter given Defendant Burnett's acknowledgment that he did not rely on such. The Court agrees that

Mulvaney's opinions are not relevant with respect to the initial decision by Defendant Burnett to deny Plaintiff's request for an ankh cross. To the extent, however, that Mulvaney's opinion impacts Burnett's continuing refusal to permit Plaintiff to purchase an ankh cross, the Court finds such to be very relevant.

Stated differently, Defendant Burnett's motion for summary judgment raises two separate and distinct issues: (1) whether the initial decision to deny Plaintiff's request for an ankh cross violates Plaintiff's rights under RLUIPA or the First Amendment, and (2) whether the continued refusal to deny Plaintiff's request, on the grounds that such might constitute a security threat, is a legally sufficient basis for denying Plaintiff's request for an ankh cross. This distinction is significant because Plaintiff is seeking both monetary and injunctive relief. For example, if the Court were to find that Defendant Burnett is entitled to *presently* deny Plaintiff's request for an ankh cross on security grounds, such would appear to preclude Plaintiff's claims for injunctive relief, notwithstanding the fact that Plaintiff may still be able to seek monetary damages based on Defendant Burnett's initial denial (on non-security grounds) of his request for an ankh cross. Accordingly, the Court will examine each of these issues separately.

**I.       Defendant Burnett's Initial Denial of Plaintiff's Request for an Ankh Cross**[1]

   A.   Plaintiff's First Amendment Claim

While "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights," inmates clearly retain the First Amendment protection to freely exercise their religion. *See O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987) (citations omitted). To establish that this

---

[1] As Defendant recognizes, the Court addressed this particular issue when resolving Defendant Burnett's previous motion for summary judgment. However, because Defendant Burnett, in support of the present motion for summary judgment, has submitted evidence on this particular issue not previously submitted, the Court will re-examine this aspect of Defendant Burnett's motion for summary judgment.

right has been violated, Plaintiff must establish that: (1) the belief or practice he seeks to protect is religious within his own "scheme of things," (2) that his belief is sincerely held, and (3) Defendant's behavior infringes upon this practice or belief. *Kent v. Johnson*, 821 F.2d 1220, 1224-25 (6th Cir. 1987); *see also, Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001) (same); *Bakr v. Johnson*, 1997 WL 428903 at *2 (6th Cir., July 30, 1997) ("sincerely held religious beliefs require accommodation by prison officials").

Even if Defendant Burnett violated Plaintiff's First Amendment right to freely practice his religion, Burnett is nonetheless entitled to summary judgment if he demonstrates that his actions were reasonably related to legitimate penological interests. *See Flagner*, 241 F.3d at 483 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). To determine whether a prison official's actions are reasonably related to a legitimate penological interest, the Court must assess the official's actions by reference to the following factors:

1. does there exist a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;

2. are there alternative means of exercising the right that remain open to prison inmates;

3. the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and

4. whether there are ready alternatives available that fully accommodate the prisoner's rights at de minimis cost to valid penological interests.

*Flagner*, 241 F.3d at 484 (quoting *Turner*, 482 U.S. at 89-91).

Failure to satisfy the first factor renders the regulation or action infirm, without regard to the remaining three factors. *Flagner*, 241 F.3d at 484 (quoting *Turner*, 482 U.S. at 89-90) ("a regulation cannot be sustained where the logical connection between the regulation and the asserted goal

is so remote as to render the policy arbitrary or irrational"). If the first factor is satisfied, the remaining three factors are considered and balanced together; however, they are "not necessarily weighed evenly," but instead represent "guidelines" by which the court can assess whether the policy or action at issue is reasonably related to a legitimate penological interest. *Flagner*, 241 F.3d at 484 (citations omitted). It should further be noted that the *Turner* standard is not a "least restrictive alternative" test requiring prison officials "to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." Instead, the issue is simply whether the policy or action at issue is reasonably related to a legitimate penological interest. *Id.*

With respect to his initial decision denying Plaintiff's request for an ankh cross, Defendant Burnett has not asserted that his actions were reasonably related to any legitimate penological interest. As Burnett testified at his deposition, his decision to deny Plaintiff's request was based on a determination that the ankh cross is a "cultural" (as opposed to a "religious") item, unnecessary to the practice of Plaintiff's religion. (Dkt. #173, Exhibit D at 37-39). As noted above, failure to demonstrate that there exists a valid, rational connection between Burnett's decision and some legitimate governmental interest precludes summary judgment. Furthermore, as the Court previously concluded, resolution of whether an ankh cross is a cultural or religious item and whether such is necessary to the practice of Plaintiff's religious faith constitute genuine factual disputes which must be resolved at trial. *See Bakr*, 1997 WL 428903 at *2 ("a decision on whether a particular religious belief is sincerely held cannot generally be made in advance of a hearing allowing for the presentation of testimony"); *Hernandez v. Commissioner of Internal Revenue*, 490 U.S. 680, 699 (1989) ("[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of

particular litigants' interpretations of those creeds"). In sum, Defendant Burnett is not entitled to summary judgment as to this particular claim.

   B. Plaintiff's RLUIPA Claim

In relevant part, RLUIPA prohibits any government from imposing a "substantial burden on the religious exercise" of a prisoner, unless such burden constitutes the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. § 2000cc-1(a). The term "religious exercise" "includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7). While this definition of religious exercise is broad, it does require that Plaintiff's religious beliefs be "sincerely held." *See, e.g., Episcopal Student Foundation v. City of Ann Arbor*, 341 F.Supp.2d 691, 700 (E.D. Mich. 2004) (citation omitted); *Lovelace v. Lee*, 472 F.3d 174, 187 n.2 (4th Cir. 2006) (citations omitted). However, prison officials may not inquire into whether a particular belief or practice is "central" to a prisoner's religion. *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005) (recognizing that "the truth of a belief is not open to question, rather the question is whether the objector's beliefs are truly held").

While the phrase "substantial burden" is not defined in RLUIPA, courts have concluded that a burden is substantial where it forces an individual to choose between the tenets of his religion and foregoing governmental benefits or places "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Living Water Church of God v. Charter Township of Meridian*, 258 Fed. Appx. 729, 733-34 (6th Cir., Dec. 10, 2007) (citations omitted); *see also*, *Marshall v. Frank*, 2007 WL 1556872 at *5 (W.D. Wis., May 24, 2007) (quoting *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003)) (a substantial burden is one which renders religious exercise "effectively impracticable"); *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005) (recognizing that RLUIPA's institutionalized persons provision was intended to alleviate only "exceptional" burdens on religious exercise).

By the same token, a burden is less than "substantial" where it imposes merely an "inconvenience on religious exercise," *see, e.g., Konikov v. Orange County, Florida*, 410 F.3d 1317, 1323 (11th Cir. 2005), or does not "pressure the individual to violate his or her religious beliefs." *Living Water Church of God v. Charter Township of Meridian*, 258 Fed. Appx. at 734. Such conclusions recognize that RLUIPA was not intended to create a cause of action in response to every decision which serves to inhibit or constrain religious exercise, as such would render meaningless the word "substantial." *See Civil Liberties for Urban Believers*, 342 F.3d at 761.

Even if Defendant Burnett's decision to deny Plaintiff's request for an ankh cross substantially burdened Plaintiff's ability to practice his religion, Burnett is nonetheless entitled to summary judgment if he establishes that his actions constitute the least restrictive means of furthering a compelling governmental interest. *See* 42 U.S.C. § 2000cc-1(a).

Whether Plaintiff's alleged need for an ankh cross constitutes RLUIPA-protected religious exercise and whether Defendant Burnett's initial decision to deny Plaintiff's request for an ankh cross substantially burdens Plaintiff's ability to practice his faith are questions of fact which must be resolved at trial. Plaintiff has described at length some of the rituals and ceremonies regarding which the ankh cross is a necessary component. (Dkt. #178, Exhibit A at 12-23). Plaintiff further asserts that without an ankh cross he is "unable to practice [his] beliefs." (Dkt. #178, Exhibit A at 12-23; Dkt. #178, Exhibit D at ¶ 26). In response, Defendant Burnett simply advances the unsubstantiated assertion that an ankh cross is neither a religious item nor necessary to the practice of Plaintiff's religion. Furthermore, as noted above, Defendant Burnett acknowledges that his decision to deny Plaintiff's request for an ankh cross was not in pursuit of a compelling governmental interest. Thus, summary judgment as to this particular claim is not appropriate.

**II.		Defendant Burnett's Continued Denial of Plaintiff's Request for an Ankh Cross**

As noted above, in his initial motion for summary judgment Defendant Burnett did not assert that his decision to deny Plaintiff's request to purchase an ankh cross was in any way premised on security or similar concerns. With respect to Plaintiff's claim concerning his request for an ankh cross, Defendant Burnett's motion for summary judgment was denied. Defendant Burnett has now advanced a new rationale for denying Plaintiff's request for an ankh cross. Defendant Burnett asserts that "not allowing Plaintiff to possess the ankh is the least restrictive means available to prevent a potential safety and security risk to Michigan Correctional facilities." As previously noted, the Court does not find this newly stated rationale relevant as to Defendant Burnett's initial decision to deny Plaintiff's request for an ankh cross. However, the Court finds this rationale relevant to the extent that Defendant relies on such to currently deny Plaintiff's request for an ankh cross.

In support of this newly advanced rationale Defendant Burnett has submitted the affidavit of Robert Mulvaney, the MDOC Security Threat Group (STG) Coordinator. (Dkt. #173, Exhibit B). The following assertions are contained in Mulvaney's affidavit. In 1999, Plaintiff was associated with the Melanic Islamic Palace of the Rising Sun (the "Melanics"). (Dkt. #173, Exhibit B at ¶¶ 6-8). In March 1999, Plaintiff authored a writing for the Melanics, entitled "Melanic Level III Concepts," in which Plaintiff "was attempting to move the Melanics toward the alleged Kemetic origin of their alleged belief system." (Dkt. #173, Exhibit B at ¶ 6). In July 1999, Plaintiff authored an article for the Melanic Freedom Journal in which he referred to "Kemetic wisdom and Kemetic spiritual teachings." (Dkt. #173, Exhibit B at ¶ 8). In December 1999, prison officials located, within "Plaintiff's area of control," a document detailing "an organized military group within the prison system [known as] The Black Guerilla Family." (Dkt. #173, Exhibit B at ¶ 9).

In "mid-1999," prison officials intercepted correspondence "between a prisoner identifying himself as a Melanic and the Kaliph/Caliph (leader) of the Melanics." (Dkt. #173, Exhibit B at ¶ 13). This correspondence depicted "the ankh symbol over the continent of Africa and made references to the 'Afrikan Revolution,' 'Black Liberation,' 'our beloved prophet Nat Turner' and 'this movement.'" (Dkt. #173, Exhibit B at ¶ 13).

In January 2000, the MDOC determined that the Melanics were a "security threat group" and, therefore, "would no longer be granted recognition by the Department as a religious group." (Dkt. #173, Exhibit B at ¶ 10). According to Mulvaney, this determination was made in response to several incidents of violence involving the Melanics. (Dkt. #178, Exhibit C at 12-14). Once the Melanics were identified as a security threat group, "those prisoners who were known to be affiliated with the Melanics" were instructed to "turn in their Mel-Nats (triangular symbol indicating membership in the Melanic organization), Melanic literature, and materials." (Dkt. #173, Exhibit B at ¶ 10). One of the items subsequently surrendered by an unidentified prisoner was "an ankh that was decorated in the Melanic colors of green and red." (Dkt. #173, Exhibit B at ¶ 12).

Prisoners who were "known to be affiliated with the Melanics" were also given an opportunity to "renounce their affiliation/change [their] affiliation." (Dkt. #173, Exhibit B at ¶ 10). On January 19, 2000, Plaintiff "signed a Security Threat Group Renunciation/Removal Form, renouncing his affiliation with the Melanics." (Dkt. #173, Exhibit B at ¶ 11).

Mulvaney concludes that these "occurrences may be indicative of a movement of the Melanics toward the Kemetic Spiritual Science religion, as a means to re-associate and reorganize under a new name that is not designated by the MDOC as a security threat group." (Dkt. #173, Exhibit B at ¶ 14). Mulvaney asserts that Plaintiff's request to purchase an ankh cross is one of the "occurrences"

constituting evidence that the Melanics may be attempting to reorganize under the guise of the Kemetic Spiritual Science religion. (Dkt. #173, Exhibit B at ¶ 14).

The Court recognizes that operating a prison is a difficult task requiring "expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Turner*, 482 U.S. at 85. Recognizing this, courts have consistently held that issues involving "the adoption and execution of policies and practices that in [the] judgment [of prison officials] are needed to preserve internal order and discipline and to maintain institutional security" in most circumstances "should be accorded wide-ranging deference." *Flagner*, 241 F.3d at 481 (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)). However, a close examination of Defendant Burnett's newly asserted rationale for denying Plaintiff's request to purchase an ankh cross does not survive scrutiny and, therefore, does not deserve the deference normally accorded such decisions. Rather, the alleged security concerns on which Defendant Burnett now relies appear to be nothing more than an after-the-fact attempt to justify his allegedly improper behavior.

Robert Mulvaney testified to the following facts at his deposition. Plaintiff was not involved in any of the activities that lead to the MDOC characterizing the Melanics as a security threat group. (Dkt. #178, Exhibit C at 13-14). In 2000, Plaintiff renounced his affiliation with the Melanics. (Dkt. #178, Exhibit C at 16). Since that time, prison officials have neither found nor intercepted any correspondence suggesting that Plaintiff's renunciation of the Melanics was insincere or that he associates with (or has attempted to associate with) any member or former member of the Melancis. (Dkt. #178, Exhibit C at 18). There exists no evidence that Plaintiff presently represents a security threat. (Dkt. #178, Exhibit C at 19). Since the Melanics were deemed a security threat group in 2000,

there have been no incidents involving Plaintiff, an ankh, or any adherent of Plaintiff's faith that constitutes a security threat. (Dkt. #178, Exhibit C at 27-28).

Mulvaney further testified that in 1999 prison officials uncovered evidence that the Melanics "were trying to reidentify themselves" by "replacing" their Mel-Nat symbol with the ankh symbol. (Dkt. #178, Exhibit C at 25). Neither Mulvaney nor Defendant Burnett, however, have presented evidence that any such re-identification by the Melanics has taken place or been attempted.

Mulvaney also expressed the concern during his deposition that Plaintiff (prior to 2000) was allegedly "rewriting the Melanic concepts, reidentifying or remorphing or whatever word, reinventing the Melanics." (Dkt. #178, Exhibit C at 26). In an affidavit, Plaintiff asserts that because he "did not agree with the totality of Melanic doctrine" he "actively sought to change them by reintroducing foundational Kemetic Science principles and concepts." (Dkt. #178, Exhibit D at ¶¶ 2-3). Plaintiff asserts, however, that his attempts in this regard were "rejected" by many Melanics, who sought his expulsion from the organization. (Dkt. #178, Exhibit D at ¶¶ 3-13). Plaintiff further asserts that he has no "desire or intention" to "reorganize the Melanics under the symbol of the ankh cross." (Dkt. #178, Exhibit D at ¶ 23).

Plaintiff's assertions in this regard are supported by the affidavit submitted by Theodore Reynolds-X, who formally served as "legal advisor" to one the MDOC's Melanic chapters. According to Reynolds-X, many Melanic members resisted and rebelled against Plaintiff's teachings. (Dkt. #178, Exhibit E at ¶¶ 3-20). Reynolds-X asserts that "although the plaintiff knows many of these former Melanics, he is not friendly with most of them and rarely associates with them." (Dkt. #178, Exhibit E at ¶ 24). Reynolds asserts that Plaintiff has "expressed nothing but disdain and anger about his past Melanic experience - particularly the rebellion that occurred against him at KCF related to the Level III

concepts - and regrets that he ever got involved with the organization." (Dkt. #178, Exhibit E at ¶¶ 26-27). Reynolds-X further asserts that "at no time has the plaintiff ever discussed with me, or to the best of my knowledge with any former Melanic, any notion of wanting to reorganize the Melanics under a different religious symbol." (Dkt. #178, Exhibit E at ¶ 28).

In his deposition, Defendant Burnett acknowledged that Plaintiff was not involved in any of the activities that resulted in the Melanics being classified as a security threat group. (Dkt. #178, Exhibit B at 70). Burnett also acknowledged that there exists no evidence that Plaintiff associates with any former Melanics. (Dkt. #178, Exhibit B at 70). When asked how many other prisoners practiced Kemetic Spiritual Science, Defendant Burnett testified that "over the years" there had been only "a couple of prisoners" who belonged to Plaintiff's faith. (Dkt. #178, Exhibit B at 75). Defendant Burnett also testified that prisoners who describe themselves as Christian are permitted to possess an ankh cross. (Dkt. #178, Exhibit B at 60-61). It was also revealed during Plaintiff's deposition that Plaintiff is permitted to wear an ankh earring. (Dkt. #178, Exhibit A at 20-21).

The evidence submitted by Defendant Burnett is quite unpersuasive. Defendant Burnett's assertion that Plaintiff's request to possess an ankh cross constitutes a security threat is based entirely upon unsupported speculation. Putting aside the fact that Defendant Burnett has presented no evidence from which a reasonable person could conclude such is the case, Defendant's argument overlooks several very important facts. First, as Defendant Burnett acknowledged, the MDOC permits members of other faiths to possess an ankh cross. This certainly undermines Defendant's argument that the presence of an ankh cross in the prison constitutes a valid security concern. Moreover, to the extent that Defendant is concerned that permitting Plaintiff to wear an ankh cross would somehow imperil security, the Court notes that prison officials already permit Plaintiff to wear an ankh cross. As noted above,

Plaintiff is permitted to wear an ankh earring.  Defendant has submitted no evidence that permitting Plaintiff to wear an ankh cross in his ear rather than around his neck has resulted in any legitimate security concerns.  Finally, Defendant's argument overlooks the fact that following the designation of the Melanics as a security threat group in early 2000, Plaintiff was permitted to retain his ankh cross until he lost it in 2003.  If prison officials were so concerned about the security dangers presented by Plaintiff wearing an ankh cross necklace, the Court wonders why they took no action between the years 2000 and 2003 to confiscate or prevent such.

The Court's analysis would likely be much different if Defendant (or the MDOC) were seeking to prevent *any* prisoner from possessing an ankh cross.  In such a circumstance, there would arguably exist a rational connection between the alleged security threat and the chosen response.  In the present circumstance, however, Defendant has failed to persuade the Court that permitting Plaintiff to possess an ankh cross necklace constitutes a legitimate security concern.  Instead, the evidence thus far submitted reveals that Defendant denied (and continues to deny) Plaintiff's request to purchase an ankh cross based upon Defendant Burnett's personal determination as to what constitutes religious orthodoxy for members of Plaintiff's faith.  It is not Defendant Burnett's role, however, to determine religious orthodoxy for Plaintiff.

In conclusion, even according the utmost deference to the MDOC's decisions concerning security issues within prison facilities, Defendant Burnett has failed to demonstrate that permitting Plaintiff to purchase an ankh cross implicates any reasonable or legitimate security concern.  In other words, Defendant Burnett has failed to establish that the continued denial of Plaintiff's request for an ankh cross is either (a) reasonably related to a legitimate penological interest or (b) represents the least restrictive means of furthering a compelling governmental interest.  Thus, the Court recommends that

Defendant Burnett is not entitled to summary judgment as regards his continued refusal to permit Plaintiff to purchase and possess an ankh cross.

## **CONCLUSION**

As discussed herein, the Court recommends that Defendant Burnett's Motion for Summary Judgment, (dkt. #172), be **denied**.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

                                      Respectfully submitted,

Date:  July 1, 2008                                /s/ Ellen S. Carmody
                                                ELLEN S. CARMODY
                                                United States Magistrate Judge